. THOMAS GARRITY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa June 16, 1883.*

1. CRIMINAL LAW—*proving an alibi.* It is well settled that the *onus* of proving an *alibi* in a criminal case devolves upon the accused, and it must be clearly and satisfactorily established before it can avail, where the evidence otherwise makes out a clear case against him. This defence can not be made out in a case where the evidence to show the same is, in many important particulars, conflicting or unreliable.

2. SAME—*finding stolen property in possession of the accused—not essential to conviction.* Where a burglary has been committed, and money and other property taken, it is not indispensable to the conviction of one accused of the crime to trace the fruits of the crime to his possession. Convictions of this kind are frequently sustained without such·evidence, especially when the criminating evidence is strong.

3. NEW TRIAL—*on the evidence—in criminal case.* Unless this court is able to see that the jury, in finding a defendant guilty of the crime charged, have clearly erred in their conclusions of fact, it will not feel authorized to interfere with the verdict.

4. PRACTICE—*improper remarks of State's attorney.*, Where the evidence of the guilt of one convicted of crime is strong and satisfactory, the judgment will not be reversed for mere improper remarks of counsel for the People tending to prejudice the jury against the accused.

WRIT OF ERROR to the Circuit Court of La Salle county; the Hon. F. GOODSPEED, Judge, presiding.

Mr. E. F. BULL, for the plaintiff in error:

Leaving out of view all the defendant's evidence, there is absolutely no evidence of his guilt. None of the property was found on him or the party with him, and no burglar's tools. It is against the law and its policy to convict men upon suspicion. *Campbell* v. *People,* 16 Ill. 17; *People* v. *Padillia,* 42 Cal. 535.

In criminal cases "new trials have been constantly granted by this court upon its conviction that the verdicts were not warranted by the proof." *Falk* v. *People,* 42 Ill. 331; *Rafferty* v. *People,* 72 id. 37; *Sargent* v. *People,* 64 id. 327; *Lincoln* v. *People,* 20 id. 364.

Counsel for the People, in the opening statement to the jury, said: "We will prove by the records of the penitentiaries of the States of Michigan and of Illinois that the man's name is not Garrity,—that his name is Thomas Kelley. We will show by witnesses on hand and who have known him; we will show by a man who is well known in this city, —known as Frank Murray; we will show by Mr. Peck, from the State of Michigan, who conducted both Garrity and McGowan from Chicago to Grand Rapids, and from there to Jackson, Michigan,—that his real name is Kelley." Besides, an *alibi* was shown.

Mr. JAMES McCARTNEY, Attorney General, for the People:

The defendant failed to establish an *alibi.* A defendant who attempts to prove an *alibi* must cover with his proof the actual and exact time that the crime was committed. *Creed* v. *People,* 81 Ill. 565.

"Where there is a conflict in the testimony of witnesses, it is for the jury to determine to whom they will give credence." *Peeples* v. *McKee,* 92 Ill. 397.

The jury, in case of a conflict in the evidence, are the judges of the credibility of the witnesses. *Rogers* v. *People,* 98 Ill. 581; *Vanderstool* v. *Adams,* 61 id. 368; *Carey* v. *Hen-*

*derson*, id. 378; *Chicago City Ry. Co.* v. *Young*, 62 id. 238; *Lowry* v. *Orr*, 1 Gilm. 70; *Peeples* v. *McKee*, 92 Ill. 397.

All the law requires is, that the evidence shall satisfy the understanding and conscience of the jury. Absolute metaphysical demonstration of guilt is not required. 1 Starkie on Evidence, sec. 79; 2 Russell on Crimes, 726.

Mr. Justice Mulkey delivered the opinion of the Court:

On the 12th day of February, 1882, John McGowan and Thomas Garrity were tried and convicted in the La Salle circuit court for the crime of burglary, the jury fixing the term of their confinement in the penitentiary at four years and six months. A motion for a new trial having been overruled, they were severally sentenced by the court in conformity with the verdict. The accused bring the case here for review, and ask a reversal on several grounds, but chiefly on the ground the evidence does not sustain the conviction. Since suing out the writ of error it has been dismissed as to McGowan, at his own request, so that Garrity alone is now before the court.

It appears from the evidence, that on the night of Saturday, July 30, 1881, the front door of the hardware store of Thomas Drew, in the town of Lostant, La Salle county, was forcibly entered, his safe blown open, and about $5500, in money, notes and accounts, taken therefrom,—the greater portion of it being money. On the 5th of August following, McGowan and Garrity were arrested by the chief of police in the city of La Salle for this offence, the former remarking at the time that he knew he was arrested for the Lostant robbery, but he could prove an *alibi*,—that he was at Leland, on the Burlington and Quincy road, at the time. Garrity, who was arrested about an hour later than McGowan, also claimed that he was at Leland at the time of the robbery. Eliza Rogers identifies the accused, and swears they took dinner at her house at Winona, six miles south of Lostant, at half past one o'clock in the afternoon of the day of the rob-

bery.   Hugh Larney,· a policeman of La Salle, testifies that
he met McGowan and Garrity the evening before their arrest,
in La Salle, when the former remarked, "he hadn't ought to
come here,—they might be on him for the Lostant scrape."
Massey swears that he saw Garrity in Lostant Thursday
before the burglary, between seven and eight o'clock in the
evening, in the Fairfield House ; that he met him again in
Lostant about eight o'clock in the evening of the night of
the robbery, on Front street, with two other men, and that
he also met McGowan in the same place in the afternoon of
the same day, McGowan being dressed in light clothes, and
Garrity in dark.   It appears from the testimony of Conway
and others, that on Sunday after the robbery a buggy was
found in a field about a mile and· a half south of La Salle,
near which were found some notes, and other fruits of the
robbery, and about two o'clock in the afternoon of that day
two men were seen crawling away from the buggy, one of
whom had on dark pants, and the other gray ones ; one
a check shirt, the other white, and neither had on a coat.
Charles Adams thinks he saw McGowan sitting on the plat-
form of the railroad station on Thursday before the commis-
sion of the crime.   Peter Mortenson testifies that he saw
McGowan in Lostant on Thursday night preceding the rob-
bery, and thinks Garrity was with him,—is not so positive
as to Garrity ; that McGowan had on light, and the other
man darkish, clothes.   Arthur Reynolds testifies that on
the 30th of· July last, between eight and ten o'clock in the
evening, he saw Garrity, in company with two other men, in
Lostant ; that they walked under the driveway to his ware-
house.   It appears from the testimony of Maggie Kelley, that
Garrity's real name is Maurice Kelley.   She swears, on behalf
of the defendants, that Garrity came to Chicago the 11th
or 12th of July last, and remained there the balance of the
month ; that she saw him last· in the evening of July 27,
at home,—could not swear she saw him on the 28th ; that

McGowan came to their house on the 24th, and called for Garrity; that he was there, also, on the 22d. Edward Marsh states that he saw Garrity in Chicago on the 23d, and in the evening of the 28th of July. George Steadman swears that he saw Kelley and McGowan together in a saloon, in Chicago, between four and five o'clock in the afternoon of the 28th of July preceding the robbery. Nelly Donahue swears that the defendants called on her, at her house in Chicago, on the evening of July 27. John S. Kelley, brother of Maurice, the accused, testifies that he saw the latter in Chicago between one and two o'clock in the afternoon of the 28th, and thinks McGowan was with him, though he was not acquainted with the latter. On cross-examination he further states that he never knew him by the name of Thomas Garrity; that he received one letter from him from Joliet. John Howard swears to having seen the defendants together in Chicago on Tuesday, and Kelley alone on Thursday, about four o'clock in the afternoon. Lettie Reynolds swears she saw McGowan in Sandwich about half past twelve or one o'clock of the 28th. Annie Thompson states that she lived one and one-fourth miles east of Leland last July; that two men came along on the last Saturday of that month, about six o'clock in the afternoon, and one came in and got a drink of water; that the man that came in was not the man with the light clothing,—referring to McGowan; that he had a black mustache, but looked a little heavier than Garrity. Ketchum swears that the defendants were in Leland on Saturday evening, July 30; that Garrity came into his grocery store and bought some crackers, and McGowan stayed outside. It may be remarked here, that facts were drawn out on the cross-examination of this witness, which we will not stop to detail, that tend strongly to cast suspicion on his testimony. Peterson, another witness for the defence, recognizes Garrity as one who stopped at his place of business in Leland "about the latter part of July last." Oscar Raulp, a resident of

Leland, testifies that the defendants, on Saturday evening of July 30, 1881, were in V. B. Ketchum's store, of that place; that they were strangers, and he took particular notice of them. It appears from the testimony of Beecher, who was recalled by the People, that it is thirteen miles from Leland to Meriden, from Meriden to Mendota four and one-half miles, and from Meriden to Sandwich twenty-three miles. Fred Gilbert, the first witness introduced on behalf of the defence, states that he and one Robinson, since moved to Canada, were the two men seen at the buggy in the field, on Sunday evening after the robbery, but his description of himself and Robinson, and his account of the occurrence, do not accord, in some important particulars, with the account of the affair given by the People's witnesses, and upon the whole we do not regard his testimony as entitled to much weight.

The foregoing is the substance of all the testimony in the case. Much of the minor details we have omitted, for the reason we regard them as unimportant. For the same reason we have not noticed the testimony of several of the witnesses at all. It is apparent, from this review of the testimony, that the greater portion of it is directed exclusively to the question of *alibi*. This, indeed, was the controlling and absorbing issue on the trial in the court below. It is well settled that the *onus* of proving this defence devolves upon the accused, and it must be clearly and satisfactorily established before it can avail, where the evidence otherwise makes out a clear case against the accused. (1 Wharton on Crim. Law, 708, 744.) We do not think the defence is made out in this case. A careful analysis of defendant's own testimony on this question, without regard to the evidence for the People, will show that, in many important particulars, it is conflicting, and therefore unreliable. But outside of this, the decided weight of evidence upon this question is with the People. That there are many criminating circumstances tending to connect the accused with the offence charged, is clear beyond

all question, and it is also equally clear that there is no evidence pointing to any other persons as the perpetrators of the offence, except, perhaps, some tending to show they had an accomplice. The only real trouble about this case is, the absence of any evidence tracing the fruits of the crime to the possession of the accused. But while the conviction would have been much more satisfactory if evidence of this character had been adduced, still, we are unable to say that it was indispensable. Convictions in this class of cases are frequently sustained without such evidence, and to hold otherwise, as an inference of law, would lead to the gravest consequences, and often defeat the manifest ends of justice. But while the case for the People might have been greatly strengthened by evidence of the character suggested, it is, nevertheless, a strong case without it. At any rate, it is not, in our opinion, so weak, by reason of its absence, as to justify us in reversing it for that reason. We can not say the jury have clearly erred in their conclusions of fact, and unless we were able to do so we would not be authorized in interposing.

It is also assigned for error that the court gave improper instructions for the People. No specific objections have been pointed out by the learned counsel for the accused, nor are we able to perceive any. Doubtless, if they were subject to any substantial objections, counsel would have pointed them out.

It is also objected that counsel for the People indulged in improper remarks in the presence of the jury which were not pertinent to the case; and tended only to prejudice the jury against the accused. Conceding the conduct of counsel in the respect stated may be subject to criticism, yet it can not be regarded of so gross a character as to require a reversal of the judgment.

Upon the whole, we are of opinion the judgment should be affirmed, and it is so ordered.

*Judgment affirmed.*