## The People of the State of Illinois, Defendant in Error, v. Edward C. Fuller, Plaintiff in Error.

### Gen. No. 4,878.

1. SLANDER AND LIBEL—*how words to be taken.* Words brought into question in an action for slander or libel are to be taken in the sense which persons of common and reasonable understanding would ascribe to them; that is, in their ordinary or common acceptation.

2. SLANDER AND LIBEL—*what words actionable per se.* The word "filch" is actionable *per se.*

3. SLANDER AND LIBEL—*sufficiency of indictment charging criminal libel.* *Held,* that the indictment in this case, which charged a criminal libel in the use, among other things, of the word "filch," was sufficient to sustain the conviction.

4. CRIMINAL LIBEL—*what not defense to prosecution for.* *Held,* that the defendant in this case did not show that the publication made was the truth; also that he did not show that the publication in question was made with good motives, and that, therefore, he was not entitled to the benefit of section 179 of the Criminal Code, which is as follows:

"In all prosecutions for libel, the truth, when published with good motives, and for justifiable ends, shall be a sufficient defense."

5. COUNTIES—*power of county board to change allowances during term of county officer.* Where the compensation to a county officer is fixed at one sum and the clerk hire and other expenses are fixed separately therefrom, in such case, while the compensation cannot be changed during the term, the county board has power to change the allowance for clerk hire and other expenses during the term.

6. COUNTIES—*when expenditure by county officer becomes lawful.* An expenditure made by a county officer, though unauthorized at the time it is made, becomes lawful if it is subsequently approved by the county board, and such county board has power to make such approval.

Prosecution for criminal libel. Error to the Circuit Court of Lee county; the Hon. OSCAR E. HEARD, Judge, presiding. Heard

in this court at the October term, 1907. Affirmed. Opinion filed
May 20, 1908.

**Statement by the Court.** Plaintiff in error was in-
dicted for a criminal libel in the Circuit Court of Lee
county, was tried and convicted, and was sentenced to
pay a fine of two hundred dollars and costs, and to
stand committed to the county jail till fine and costs
were paid. He has sued out this writ of error to re-
view said judgment.

The first count of the indictment after the formal
parts, charged that plaintiff in error "unlawfully and
maliciously contriving and intending to villify and de-
fame one Walter B. Merriman, and to expose him to
public hatred and contempt, unlawfully and maliciously
and wilfully did publish a certain false, malicious and
defamatory libel of and concerning him the said Wal-
ter B. Merriman, and did cause and procure the said
false, malicious and defamatory libel to be printed in
a certain newspaper called 'The Dixon Daily Sun' in
the town of Dixon, in the county of Lee and state afore-
said, with intent to publish and circulate, and then and
there did publish and circulate the said false and de-
famatory libel of and concerning the said Walter B.
Merriman, so printed as aforesaid in said county of
Lee, which false, malicious and defamatory libel of
and concerning the said Walter B. Merriman so pub-
lished, printed and circulated in said county of Lee,
is in the words and figures as follows." The article
is of such great length that it cannot be here repro-
duced. The heading read as follows: "Money Il-
legally Filched. Large Sums Found to Have Been
Taken by Treasurers Merriman and Sterling:" with
the innuendo that Merriman meant said Walter B.
Merriman. The article stated that John M. Sterling
was elected county treasurer in 1898, and was succeded
by Walter B. Merriman; that Sterling was under
Merriman for a time, and now was again a candidate
to succeed him in that office; that the system of alterna-

tion on this office had been an expensive one for the taxpayers; and it set out that the board of supervisors in September, 1898, fixed the salary of the county treasurer for the ensuing four years at $1,200 per year, and the deputy hire at $800 per year; and that the statutes of Illinois, besides these amounts, provide that the county treasurer shall receive $500 per year as supervisor of assessments, and that that act went into effect July 1, 1898. The article then contained a long account of action by Sterling while county treasurer whereby as was alleged he illegally drew certain sums for clerk hire and miscellaneous expenses. It then had another heading, as follows: "W. B. Merriman more greedy." The article then declared that Merriman took the office under the same legal provisions and salary as Sterling did; that the board of supervisors fixed the salary and deputy hire at the same figure, and the salary of the supervisor of assessments was the same; yet that in the three years thus far reported to the county board by Merriman he had illegally drawn, over and above all the money he was legally entitled to, the sum of $802.30. It then gave an itemized statement of the sums which he had drawn in 1903, 1904 and 1905 respectively, and continued as follows: "According to the records, Mr. Merriman has illegally drawn the following amounts:

Dec. 1903 Misc. Exp.................................... $ 57.97
Dec. 1903 Pub. Acct. and Ext. Clerk Hire.   656.43
Dec. 1904 Misc. Exp....................................    48.68
Dec. 1905 Misc. Exp....................................    39.22
      Total................................................. $802.30"

The article then contained other charges that Merriman and Sterling had overpaid the tax collectors of Dixon township; that these tax collectors had been made to pay the money back into the treasury of the people, and as the tax collectors were compelled to return the money illegally taken by them, the article asked why it was not just and right that Sterling and

Merriman should also return the funds drawn by them in excess of their legal compensation for their services; and that if they were not satisfied with this amount they should not have sought the office, and Sterling should not seek it again.

The second count of the indictment, besides the more general charging language, set out as the article published only the heading contained in the first article, namely, "Money Illegally Filched. Large Sums Found to Have Been Taken by Treasurers Merriman and Sterling." There were in each count innuendoes applying the article to said Walter B. Merriman.

WM. BARGE, BROOKS & BROOKS, E. E. WINGERT and J. W. WATTS, for plaintiff in error.

C. H. WOOSTER, State's Attorney, A. C. BARDWELL and E. H. BREWSTER, for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

1. It is argued that the publication set out in the indictment does not charge Merriman with a criminal offense; that "filch" does not necessarily import a crime, and therefore it is not libelous *per se;* that the indictment should have charged whether that word was used with an innocent or criminal meaning, and that in the absence of such an allegation the court must construe the language in the harmless sense, and should hold that the pleader only intended to charge that it was used in an innocent sense. It is the established rule in this state that words brought into question in an action for slander or libel are to be taken in the sense which persons of common and reasonable understanding would ascribe to them; that is, in their ordinary or common acceptation. Nelson v. Borchenius, 52 Ill. 236; Barnes v. Harmon, 71 Ill. 609; Ransom v. McCurley, 140 Ill. 626. This doctrine has been followed by the Appellate Courts frequently, as ex-

amples of which we cite Prussing v. Jackson, 85 Ill.
App. 324, 332, and Harkness v. Chicago Daily News
Co., 102 Ill. App. 162. What then is the common and
ordinary meaning attributed to the word "filch"?
There is an old case in Croke's Elizabeth which holds
that the words "a common filcher" are not actionable
*per se,* and that authority is noted in the text books.
Nevertheless, the English dictionaries show that the
primary and ordinary meaning of the word is to steal;
especially in a small, sly, underhanded manner; to pil-
fer. Roget's Thesaurus of English Words gives as
the chief synonyms of filch: "steal, thieve, rob, pur-
loin, pilfer." The Standard Dictionary defines "filch,"
"to steal, especially slyly and in small amounts; to
pilfer." For synonyms, it refers to the word steal,
and gives these synonyms of "steal:" "abstract, com-
mon larceny, common theft, embezzle, extort, filch, pil-
fer, pillage, plunder, purloin, rob, swindle." In the
same connection it says, "the word *filch* is ordinarily
applied to things of little value, but may apply to the
most precious." The idea of theft, of stealing, is in
the word as commonly used. It is true that one dic-
tionary gives as an incidental or remote meaning, "to
take from another by a violation of trust or good
faith." That however is not the direct or usual ac-
ceptation of the term. It is argued that if it could
ever have such a meaning, not implying a crime, then
it is not actionable *per se,* and the intent to charge
larceny should have been averred. We do not admit
the soundness of this position, as applied to a case
where the meaning which does not include a crime is
not the natural and obvious meaning of the word as
used by persons of ordinary understanding. If such
a principle were applied, few words would be held ac-
tionable *per se.* We suggest two common examples.
The word "steal" is given in the dictionaries not only
in its chief meaning, "to take and carry away feloni-
ously, as the personal goods of another," but also in
at least three other meanings which do not involve the

idea of crime. ''Thief'' has a secondary or figurative meaning which has no relation to crime. Yet it is clear that to call a man a thief, or to accuse him of stealing, is to use language actionable *per se*. The reason is that the common and ordinary acceptation and use of those words is in a sense embodying crime. The same suggestions apply to the word ''filch''. In common use and acceptation it includes the idea of stealing, adding thereto the sense of slyness, and sometimes by taking small things. We are of opinion that it is not deprived of its ordinary meaning of a crime by using it in connection with the word ''illegal'' or with ''large sums''. Our statute defines libel as, ''A malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby expose him to public hatred, contempt, ridicule or financial injury.'' We are of opinion that the averments of this indictment are sufficient under said statute, and under Clay v. People, 86 Ill. 147, Crowe v. People, 92 Ill. 231, and People v. Seeley, 139 Calif. 118. The indictment shows the heading first above stated as given in large letters, but that does not fully show the appearance at the head of the article, originals of which are in the record before us. The word ''money'' and the word ''taken'' at the head of said article are in very heavy black type, each letter being about an inch and three-eighths in length and from half an inch to three quarters of an inch in width; and the words ''illegally filched'' and the other words in said heading are about half an inch in height and the letters of proportionate width. The heading, containing the charge that Merriman had ''filched'' large sums of money, was therefore made very prominent and was obviously intended to attract special attention.

2. Section 179 of the Criminal Code enacts: ''In all prosecutions for libel, the truth, when published with

good motives, and for justifiable ends, shall be a suf-
ficient defense.'' So also reads section 4 of article 2 of
the Constitution. It is contended that the record estab-
lishes such a defense. On the contrary, the record
shows nothing to justify the allegation that Merriman
filched or stole any money. The part of the article
containing the most serious libel was therefore untrue.
An examination of the record also shows that as to
the moneys referred to in that part of the article di-
rected against Merriman, there was no warrant for
saying that there was any illegality in connection there-
with. This indictment does not involve the truth or
falsity of the charges against Sterling, and we there-
fore do not discuss them. We have already set out
in the statement preceding this opinion that part of
the article which enumerated the sums which Merri-
man was therein charged with having illegally drawn
from the public funds amounting in all to $802.30. The
proof shows that nearly all of said sum of $656.43 said
to have been illegally taken by Merriman in 1903 from
the county treasury, was paid by him for the publica-
tion of the assessment roll for that year. Section 29
of the act of 1898 for the assessment of property re-
quires the county treasurer as *ex-officio* supervisor of
assessments to cause a full and complete list of the
assessments by townships to be published in some pub-
lic newspaper in the county, and that where there is
published in a township one or more newspapers of
general circulation, the list for such township shall be
published in one of the newspapers published in said
township; and further, that ''the expense of such print-
ing and publication shall be paid out of the county
treasury.'' There were a number of such newspapers
published in the different townships of Lee county, and
Merriman distributed the publication among them as
the law required. As he was commanded by law to
cause the publication to be made, and did cause it to be
made, and as the expense therefor was by law directed
to be paid out of the county treasury, it cannot be said

that Merriman, the county treasurer and county assessor and supervisor of assessments, paid this money illegally, even though he might have laid the bills before the county board prior to paying them.

There was embraced in this total of $802.30 alleged to have been illegally drawn by Merriman a small sum each year for extra clerk hire. The proof showed that before Merriman was elected to the office of county treasurer the county board adopted the following recommendations by its fees and salaries committee, to wit: "That the county treasurer be allowed to employ extra clerk hire, if necessary, on account of the work imposed on the office of the said treasurer by his being *ex-officio* supervisor of assessments." That order was never afterwards rescinded. There was uncontradicted proof that with the force in Merriman's office it was impossible to get out the assessment list for publication in the different pages in the different townships within the time required by law. It appears to be the established construction of the constitution and the law in this state that where the compensation of a county officer and his clerk hire and the expenses of his office have been fixed by the county board in one gross sum before he takes the office, that allowance cannot be in any respect changed during the term of office of such officer. Brissenden v. County of Clay, 161 Ill. 216; Coles County v. Messer, 195 Ill. 540. Where, however, the compensation is fixed at one sum, and the clerk hire, or the clerk hire and other expenses, are fixed separately therefrom, in such case, while the compensation cannot be changed during the term, the county board has power to change the allowance for clerk hire and for other expenses. The county board cannot be compelled to make a change, and if it has not made a change, and refused to approve further expense made by the officer, he cannot collect therefor from the county. If the officer conceives the expense to be necessary, and incurs it without authority, he does so in the first instance at his own risk and expense. But if the

county board afterwards approves the expenditure, it then becomes a valid county charge. In County of La-Salle v. Milligan, 143 Ill. 321, 330, the court said: "The amount allowed for deputy and clerk hire and expenses of the office is largely in the discretion of the county board, and might be changed at any time as in its judgment the exigency of the public service demanded." In Coles County v. Messer, *supra,* the court on page 545, said: "If the amounts are fixed separately, the compensation, aside from the expenses, cannot be changed during the official term; but the expenses may be changed from time to time by the county board as the necessities of the office may change." In Whitmore v. People, 227 Ill. 453, 469, the court said: "The cases above cited hold that when an amount for clerk hire and expenses has been fixed by the county board, the officer is not entitled to receive from the county anything for money actually expended for clerk hire in excess of the amount-allowed him by the county board for that purpose." The court then quotes at length from Daggett v. Ford County, 99 Ill. 334, including the following language: "The power of fixing the amount of necessary clerk hire, etc., is devolved by the constitution on the county board as a fair and impartial tribunal, and it is to be supposed that they will perform the duty in good faith as it rests upon them under the constitution. Should it be found at any time that the board had committed an error in judgment, and not allowed an amount sufficient for necessary clerk hire, etc., the construction which we have heretofore adopted that the amount once fixed for necessary clerk hire, etc., when it is fixed separate from the allowance for personal services, is subject to be changed from time to time during the term of office as the board may see fit, will enable the board to afford any suitable relief in this regard, and it may be expected that this will be sufficient for the avoidance of any serious injustice being done to officers in any underestimating by the county board of the neces-

sary expenses of their offices." This construction of the constitution is carried out in the statute. Section 51 of chapter 53 of the Revised Statutes, relating to fees and salaries, requires each county officer who shall be paid in whole or in part by fees "to keep an account of the expenditures made by him on account of clerk hire, stationery, fuel and other expenses;" and make report in June and December to the county board; and the county board is required to carefully audit and examine every such report and ascertain the balance, if any, held by such officer, "after such expenses as said board may approve or allow," and his salary, etc., have been deducted from the gross amount, and shall order the balance paid into the county treasury, etc. It will thus be seen that the statute contemplates that the county officer will make these expenditures before they are presented to the board for approval; but that if the board fails to approve and allow any expense which he has made outside of the sum previously fixed by the county board, it will be at his own risk and expense. The county board approved of the sum expended by Merriman for clerk hire, and it was therefore a legal and valid county charge. There was also a charge for the rent of a typewriter, and all the rest of the items entering into said sum of $802.30, alleged to have been illegally drawn, were small expenditures during the years 1903, 1904 and 1905, which the board approved and allowed. It is obvious that there are expenses in such an office, such as fuel, lights, pens, penholders, ink, paper and the various instruments and blanks necessary or proper for the conduct of the public business, that cannot always be fully foreseen and properly estimated in advance by the county board. The authorities above cited and the statute above referred to, confer full authority upon the county board to approve and allow expenditures for such matters in excess of the amount originally fixed by the board. The board approved each of these items, and they were all therefore valid

county charges; and the accusation made against
Merriman in the publication complained of that he
had illegally taken money belonging to the county is
not sustained.

But again, not only was the charge of filching and
the charge of paying county money illegally not sus-
tained, but further the truth, to be a sufficient defense,
under the constitutional provision and statute above
referred to, must be published with good motives.
There was proof of statements made by plaintiff in
error, both before and after this publication, which
strongly tended to show that his motives in making
this publication against Merriman were malicious.
Plaintiff in error denied making these statements; but
we must assume here that the jury believed the testi-
mony that he made them. The publication complained
of stated that these alleged illegal expenditures would
appear from the records of the county board, but it
failed to state the important circumstances that the
county board had approved and allowed all these ex-
penditures; and this omission had a tendency to im-
peach the motives with which the publication was
made.

3.   It is contended that plaintiff in error is not re-
sponsible for this article as published, and especially
that he is not responsible for the libelous heading.
The newspaper in which this publication was made,
named "T. W. and E. C. Fuller" as the publishers,
and plaintiff in error is the E. C. Fuller there named.
There was proof that he was editor in chief and half
owner.   There was proof by plaintiff in error that
the paper was published by the Dixon Sun Company,
of which company plaintiff in error was president and
a director.   He wrote the editorial part of the paper,
and assisted in directing its policy, and he wrote the
body of the article.   H. E. Ward was the managing
editor, and wrote the head lines of this article.   Plaint-
iff in error gave the article to Ward for the purpose
of having him write the headlines.   After the article

was printed, on October 31, 1906, plaintiff in error saw it, with the headings, and he directed this and other articles to be kept in type and printed a few days later as an insert; and when the postmaster would not accept the newspaper with those inserts, plaintiff in error took part in mailing and distributing over the county a large number of sheets containing this article with this heading. He himself mailed a part of the sheets containing this article. Proof of the second publication was competent as tending to show malice; and indeed the people were not obliged to rely upon the first publication, but could prove and rely for conviction upon the publication of the article at either time. The responsibility of plaintiff in error for the publication of the entire article, including the headlines, is fully established.

4. It is argued that the court erred in refusing to allow plaintiff in error to prove that the county board allowed Merriman a salary of $500 per year for his services as supervisor of assessments, and that he received that salary. This allowance was illegal. Foote v. Lake Co., 206 Ill. 185; Parker v. County of Richland, 214 Ill. 165. But this was not the illegal action to which this publication related. The article did not charge that Merriman had illegally received this salary as supervisor of assessments, but on the contrary it stated that that allowance to Merriman was lawful. Plaintiff in error was indicted for publishing of Merriman that he had "filched" certain specific sums. It was not a defense to show that Merriman had illegally received other money. But it is argued that this proof was competent under the second count, which only set out the headlines of the article. The whole article was in evidence, and it showed to what the headlines referred, and showed that they did not refer to the salary of supervisor of assessments. The proof was properly rejected.

5. Complaint is made of the ruling of the court upon the instructions. The court modified the four-

teenth instruction requested by plaintiff in error, by inserting the word "material" before the word "allegation". The use of the word "material" in this connection seems not to have been erroneous or harmful under the rule laid down in Harvey v. C. & A. Ry. Co., 221 Ill. 242. The jury was very fully instructed, and the instructions clearly showed what allegations were material; and the jury could not have been misled by the use of that word in that instruction. We have examined the other objections to the instructions, and conclude that they are not well founded. We find no reversible error in the record. The proof appears to establish the guilt of plaintiff in error and the punishment is mild.

The judgment is therefore affirmed.

*Affirmed.*