## The People of the State of Illinois, Defendant in Error, v. Marc A. Blumenberg et al. William Geppert, Plaintiff in Error.

### Gen. No. 5,823.

1. CONSPIRACY, § 20*—*what is conspiracy at common law.* A conspiracy at common law is a combination of two or more persons to accomplish, by concerted action, a criminal or unlawful purpose, or a purpose not in itself criminal, by unlawful or criminal means.

2. CONSPIRACY, § 50*—*sufficiency of evidence to show conspiracy to extort money.* The evidence *held* sufficient to show a criminal conspiracy between the publishers of a trade journal to extort money from, and to injure the character, credit and business of a manufacturer, by threatening to and actually publishing derogatory articles concerning him and his business.

3. CRIMINAL LAW, § 51*—*venue of conspiracy to extort money by publication in foreign paper.* Where the evidence shows a conspiracy to extort money from and to injure the character, credit and business of a manufacturer by publishing in a trade journal, printed in another State, false, malicious and scandalous matter concerning him and his business, the venue of an indictment is sufficiently shown by proof that the defendants caused copies of such journal containing the articles in question to be circulated in the county where the indictment was found.

4. CONSPIRACY, § 50*—*sufficiency of evidence of circulation of publication intended to extort money.* The evidence on a prosecution for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer by the publication in a trade journal of false, malicious and scandalous matter, *held* sufficient to show the circulation of such matter within the county where the indictment was found.

5. CONSPIRACY, § 49*—*when circulation in county presumed of publication intended to extort money.* The presumption of the circulation in a county where an indictment was found for conspiracy to extort money by publishing in a trade journal of large circulation, printed in another State, false, malicious and scandalous matter concerning the character, credit and business of a manufacturer, does not answer the requirement of legal proof that the publication reached such county, but operates merely in support of evidence which might otherwise be regarded as uncertain and indefinite.

6. CONSPIRACY, § 50*—*sufficiency of evidence to show overt acts in county of venue.* The evidence on a prosecution for conspiracy

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to extort money from and to injure the character, credit and business of a manufacturer, *held* to show the performance of acts in the furtherance of the conspiracy within the county where the indictment was found.

7. CRIMINAL LAW, § 287*—*when venue question for jury.* The question of venue on a criminal prosecution is one of fact for the jury, and must be established by the same measure of proof as any other material fact.

8. CRIMINAL LAW, § 52*—*sufficiency of evidence of venue.* The evidence on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, *held* sufficient, in the absence of proof to the contrary, to establish the venue in the county where the indictment was found.

9. CRIMINAL LAW, § 51*—*venue of prosecution for conspiracy to extort money by means of defamatory publication.* A prosecution for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer by false and malicious publications in a trade journal printed in another State, will lie in the county where the business is located and copies of such journal circulated by the defendants.

10. CONSPIRACY, § 37*—*when indictment does not charge separate offenses.* An indictment for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer by false and malicious publications in a trade journal, *held* not to charge separate and distinct offenses in the same count.

11. CONSPIRACY, § 49*—*admissibility of evidence of conduct of co-conspirator prior to conspiracy.* On a prosecution for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer, evidence is not admissible to prove the acts and sayings of an alleged co-conspirator previous to the time when the evidence tends to establish the existence of a conspiracy.

12. CONSPIRACY, § 49*—*competency of declarations of one conspirator.* Declarations of one alleged conspirator made before the formation of the conspiracy are competent evidence against him but not against his co-conspirators.

13. CONSPIRACY, § 49*—*admissibility of evidence of conduct of one conspirator.* Evidence on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, of the conduct of one alleged conspirator, *held* admissible as bearing on the question whether the conspiracy was formed before a certain date.

14. CONSPIRACY, § 49*—*when evidence sufficient to show date of formation of conspiracy.* The evidence on a prosecution for con-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

spiracy to extort money from and to injure the character, credit and business of a manufacturer, *held* sufficient to show the formation of the conspiracy before a certain date.

15. CONSPIRACY, § 50*—*when proof of wrongful act evidence of conspiracy.* On a prosecution for a conspiracy to do a wrongful act, proof of the doing of such act is evidence of a previously formed design.

16. CONSPIRACY, § 22*—*when conspiracy to do unlawful act complete.* The crime of conspiracy to accomplish a criminal or unlawful purpose, or a lawful purpose by unlawful or criminal means, or to do an act constituting the statutory crime of conspiracy, is complete when the agreement is made.

17. CONSPIRACY, § 49*—*when overt acts evidence of previously formed design.* Overt acts done in carrying out a conspiracy to accomplish a criminal or unlawful purpose, or a lawful purpose by unlawful or criminal means, or to do any act constituting the statutory crime of conspiracy, are evidence of a previously formed design.

18. CONSPIRACY, § 49*—*when overt acts evidence of conspiracy.* The attack in a trade journal, on the character, credit and business of a manufacturer, is evidence of a preconceived plan on the part of the publishers; and on a prosecution for conspiracy to extort money from him, it is not necessary to show a meeting and consultations between the indicted parties, since the conspiracy might be implied from overt acts.

19. CONSPIRACY, § 25*—*sufficiency of combination or agreement.* It is not necessary that the plan of a conspiracy to extort money from and to injure the character, credit and business of a manufacturer should embrace in detail in its early stages the various means by which it should be executed, since it is sufficient if there was a general plan to accomplish the result sought by means that might from time to time be found expedient.

20. CONSPIRACY, § 45*—*when necessary to set out in indictment means of carrying out conspiracy.* An indictment charging conspiracy in the language of the statute, *held* sufficient against the objection that it did not set out with sufficient particularity the means by which the conspiracy was entered into, or by which it was to be carried into effect.

21. CONSPIRACY, § 47*—*when variance shown between pleading and proof.* The evidence on a prosecution for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer, *held* not to show a variance from the indictment.

22. CONSPIRACY, § 49*—*when evidence of absence of co-conspirator from county not proof of flight.* Evidence on a prosecution

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, that one of the indicted persons was and had been for some time in a foreign country, *held* not evidence that he had fled the country.

23. CONSPIRACY, § 49*—*admissibility of evidence of absence of co-conspirator from county.* It may be shown on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer that one of the indicted persons was and had been for some time in a foreign country.

24. CONSPIRACY, § 51*—*when argument of prosecuting attorney not prejudicial.* An argument of the prosecuting attorney on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, that one of the indicted persons who was not put on trial had sought safety in a foreign country, *held* not prejudicial to the defendant.

25. CONSPIRACY, § 51*—*when remarks of court not prejudicial.* Remarks of the trial court on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, as to the admissibility of certain testimony together with the comments of the prosecuting attorney thereon, *held* not prejudicial to the defendant.

26. CRIMINAL LAW, § 236*—*when improper remarks of prosecuting attorney not prejudicial.* While remarks to the court of the prosecuting attorney on a criminal prosecution must be guarded by the court so as not to improperly influence the jury, and improper remarks must be rebuked and suppressed, yet the question whether a remark is intended or likely to improperly influence the jury is particularly within the knowledge of the trial judge, and much must be left to his judgment and discretion in disposing of a motion for a new trial.

27. CONSPIRACY, § 52*—*sufficiency of instruction on prosecution for conspiracy to extort money.* An instruction on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, containing the phrase "as charged in the indictment," which consisted of several counts, *held* not objectionable where all of the counts were good.

28. CRIMINAL LAW, § 558*—*when refusal of requested instructions not error.* Error cannot be assigned by the defendant in a criminal prosecution, on instructions given on behalf of the State, similar to those given at the request of the defendant.

29. CONSPIRACY, § 52*—*when instruction as to fair comment sufficient on trial for conspiracy to extort money by malicious publication.* On a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer,

by false and malicious publications in a trade journal, the jury *held* sufficiently instructed as to the law of fair comment.

30. LIBEL AND SLANDER, § 56*—*what constitutes fair comment*. Erroneous opinions, unwarranted inferences and unsound arguments expressed in print in harsh and violent language calculated to ridicule, defame or cause pecuniary loss, do not amount to fair comment of a person's character or business.

31. CONSPIRACY, § 32a*—*when conspiracy to maliciously publish truth concerning person is indictable*. For two or more persons to unlawfully combine to defame another by publishing true statements concerning him, with malicious intent and motive to wrongfully and wickedly defame and injure his character or impeach his honesty, virtue and reputation, so as to expose him to public hatred, contempt and ridicule, constitutes a criminal conspiracy.

32. CONSPIRACY, § 52*—*sufficiency of instruction as to doing wrongful act under conspiracy*. An instruction on a prosecution for a conspiracy to extort money from and to injure the character, credit and business of a manufacturer, that the defendants should be found guilty if they conspired together and carried out a wrongful act within a county, *held* not prejudicial because of the omission to observe the technical distinction between acts and overt acts.

33. CONSPIRACY, § 52*—*instruction as to what amounts to execution of conspiracy*. An instruction on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, to the effect that it was not necessary to constitute the crime, that the conspirators should have succeeded in their design, but that it was enough if a common design was formed, and any act in furtherance of such design was thereafter done in the county where the indictment was found, and that the acts of any one of the conspirators in furtherance of the common design would be the act of all, *held* not prejudicial to the defendant because failing to observe the technical difference between acts and overt acts.

34. CONSPIRACY, § 52*—*sufficiency of instructions as to conspiracy to extort money*. The instructions given on a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, *held* not prejudicial to the defendant.

35. CRIMINAL LAW, § 357*—*motion for new trial on ground of newly-discovered evidence*. A motion for a new trial on the ground of newly-discovered evidence, in a prosecution for conspiracy to extort money from and to injure the character, credit and business of a manufacturer, *held* properly overruled.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The People v. Blumenberg, 193 Ill. App. 119.

Error to the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the October term, 1914. Affirmed. Opinion filed December 3, 1914. Rehearing denied April 7, 1915.

EDWARD A. ALEXANDER and BRUNDAGE, LANDON & HOLT, for plaintiff in error.

ROBERT W. MARTIN and SNAPP & HEISE, for defendant in error; PATRICK J. LUCEY, FREDERICK BURNHAM and D. D. SNAPP, of counsel.

MR. PRESIDING JUSTICE CARNES delivered the opinion of the court.

William Geppert, plaintiff in error, was tried alone in the Will County Circuit Court at the January term, 1913, on an indictment found at the March term, 1912, charging him and Marc A. Blumenberg, Thomas B. Thompson and Bernard S. Maloy, in different counts, with the statutory crime of conspiracy, and the common-law crime of conspiracy, to extort money from and injure the character, employment and business of John V. Steger and to injure the business and credit of Steger & Sons Piano Manufacturing Company and the Singer Piano Company, two corporations, each manufacturing pianos at Steger, Illinois, and each dominated and controlled by John V. Steger, and dependent upon his capital, business management and influence for success, by composing, publishing and circulating orally and in writing, and particularly through the Musical Courier Extra, false, malicious and scandalous matter, unfavorable comment and adverse criticism concerning John V. Steger and his business and by threatening to compose and publish such matter. Thompson and Maloy were before the trial in some way discharged. The record shows them released "from bail and further prosecution upon proofs and arguments." Counsel for plaintiff in error say they were no doubt discharged because of failure to prose-

cute them within the time required by the statute, and we assume that is true. Blumenberg was never apprehended. He was in Paris at and before the time of the trial, and the record shows that he has since died. Geppert was found guilty by a jury and his punishment fixed at imprisonment in the penitentiary for two years and a fine of $2,000. The court after overruling motions for new trial and in arrest of judgment entered judgment on the verdict, and Geppert prosecutes this writ of error therefrom.

Section 46 of our Criminal Code (J. & A. ¶ 3547), so far as applicable here reads: "If any two or more persons conspire or agree together * * * with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business * * * or property of another, they shall be deemed guilty of a conspiracy; and every such offender * * * and every person convicted of conspiracy at common law, shall be imprisoned in the penitentiary not exceeding five years, or fined not exceeding $2,000, or both." Conspiracy at common law may be defined as: "A combination of two persons or more, by a concerted action, to accomplish a criminal or unlawful purpose, or a purpose not in itself criminal, by unlawful or criminal means." *Heaps v. Dunham,* 95 Ill. 583.

The claim of the prosecution is that Blumenberg and Geppert were, and had been for many years through the agency of a corporation which they controlled, publishing a musical trade journal in the city of New York known as the "Musical Courier Extra" with a large and general circulation among manufacturers of and dealers in musical merchandise throughout the United States and some foreign countries; that Blumenberg was the editor in chief and Geppert the managing editor of the paper; that they were closely associated together in its management and control and together dictated and were responsible for its contents, each writing a considerable part thereof; that they solicited

and carried advertisements of manufacturers of pianos and received therefor compensation in the ordinary manner of dealing between publications advertising goods, and manufacturers and merchants advertising and selling them; that they also published in their paper laudatory articles concerning the business and goods of their advertising patrons under the head of observations and editorials, which they called "specials," for which they expected and received compensation based in part on the value and volume of the business conducted by such patron; that John V. Steger through his said two corporations was and for a long time had been extensively engaged in the manufacture and sale of pianos at the village of Steger, which village is located in Will and Cook counties, and was largely built up by him and dependent on his manufacturies; and that he had become extensively interested in real estate in the village of Steger by furnishing homes to his employees, to be paid for under contracts on the instalment plan; that in the year 1907, and for some years prior thereto, he was carrying advertisements, as such, in the Musical Courier Extra and paying for them at rates varying from $600 to $1,000 a year; that Blumenberg and Geppert were dissatisfied with the amount that he was paying for advertising in their paper and thought because of the volume of his business, which was very large, that he ought to pay a much larger sum; that they began in 1907 by threatening to publish articles derogatory to his business and character, to try to induce him to pay more for the good offices of that publication in advertising his business, and to pay large sums for laudatory articles; that Steger sufficiently yielded to their demands so that their business relations continued until 1909, when they attempted to extort a large sum of money from him by threats of blackmail, and failing, they began and continued in their publication a persistent, virulent attack on his private and business

character, the quality of his goods and his methods of dealing in his manufacturing and real estate business; that publications of false charges, unfavorable comment and adverse criticism were frequent and continued up to the time of the indictment, and the papers containing the same were sent to and circulated in Will county. There was offered in evidence articles so published between these dates that occupy more than 200 pages of the printed abstract, and Steger with great ingenuity and facility of language is pictured as a man of moral depravity, entirely lacking business honesty. A more skilful and violent attack on the moral and business character and business of an individual than was thus made cannot well be imagined. It is clear from the record that the charges and comments were not such as would be made by any publication with an honest intention to serve the public by the exposure of a bad man or a bad business. There are no doubt many statements in the articles so published that are true, and others that are false but might be presumed to be reasonably supposed true by the author. A business as large and varied as Mr. Steger was conducting must needs be open to errors and imperfections that are the subject of fair comment and criticism; but after liberal allowances on that ground, it is clear from a reading of the articles themselves that they were published from bad motives and with malicious intent, and when read in connection with the evidence there is left no doubt that the attack was threatened by Geppert and Blumenberg to induce Mr. Steger to buy their advertisements, and carried on for that purpose from motives of malice and ill-will to him, and perhaps to show others similarly situated the power of the Musical Courier Extra and warn them that demands for advertising patronage must not be disregarded.

There can be no question about the legal effect of the facts, if so found, on the question whether there was a conspiracy to extort money and injure reputa-

tion and business. It is no answer to say that the advertisements offered Steger were such as he ought to buy and worth more than he was asked to pay for them. They had no more right to force their goods on him than he had to force them to buy one of his pianos, which he certainly could not legally have done, however cheaply he might have offered it or however indispensable it might have been to their welfare and happiness. The evidence sustained the People's claim, and the only question in the case is whether the defendants received a fair and impartial trial according to the established rules of law.

It is strongly urged that the prosecution failed to establish the venue in Will county and said: "The venue of a conspiracy is in the county where the corrupt agreement is entered into, or in any other county where one of the conspirators commits an overt act in furtherance of the conspiracy." An overt act in criminal law is an open manifest act from which criminality may be implied. Black's Law Dictionary.

It is discussed in *Dealy v. United States,* 152 U. S. 539, as an act in furtherance of a conspiracy, an act done according to and in pursuance of a conspiracy, an act done in carrying out a conspiracy. If the conspiracy be admitted, and there is proof that the conspirators, or one of them, caused copies of the paper containing the articles in question to be sent into Will county, we assume that act sufficient to establish the venue of that county. We do not understand counsel to deny that position, but they insist there is no sufficient proof of that fact. It does appear that the post office in Steger is on the Will county side of the village; that residents of Will county received at that post office copies of the papers containing the articles in wrappers upon which was printed, "Musical Courier Extra of New York City"; there is also evidence that many copies of the paper were found in Steger on the Will county side in December, 1911, and January and February, 1912, at which time many of the articles

in question were published, but it does not definitely appear which, if any, of these articles were in the papers so found. The Musical Courier Extra had a wide circulation. Geppert in testifying on the trial said: "There was never any trouble about finding a copy of it in a piano house," and plaintiff's counsel call our attention to the fact that it had a large list of subscribers and was for sale in Chicago and other places in large numbers. The publishers, Blumenberg and Geppert, apparently employed the usual and customary means of getting their paper into·the hands of the public, and with great success. When we remember the population of Will county and of the cities therein, which we judicially know, and apply a knowledge of human affairs that we are supposed to possess in common with all mankind, we naturally presume that a paper of that circulation containing article after article attacking a business of the importance of the Steger concerns in Will county, and attacking the real estate transactions extensively carried on in the village of Steger, as these articles did, must have got into Will county in considerable numbers through agencies employed by the publishers to place the papers in the hands of the people. But we do not hold that such presumption answers the requirement of legal proof that the paper did so get there, still we think the presumption operates in support of proof that might otherwise be regarded as uncertain and indefinite. Allegations of facts that are highly probable are supported, certainly so far as a jury is concerned, by less proof than would be required of improbable allegations. We assume that on a judicial hearing the fact that the Chicago Tribune was circulated in Will county by its publishers on some given day of a recent date could not be found without technical evidence that it did reach the inhabitants of that county through agencies of the publishers; but the fact would be found by a jury on much less evidence than they would require to establish that some individual sent a circular or letter into the county at a

given time; and no court would refuse to accept the verdict of a jury dependent on such a finding except in the absence of any legal proof. The data from which some of the articles were written was furnished by defendant Maloy, who lived in Steger on the Will county side and was making inquiries and investigations among the workmen in the Steger factories, which were in large part located on the Will county side of the line: Some of the most vicious articles were based on information so furnished by Maloy. It is said by counsel for plaintiff in error that it does not affirmatively appear that any of his work was done on the Will county side of the village, and it is true that the evidence does not sufficiently point out any act that Maloy did in Will county; but we are of the opinion that considering the fact that he lived there, and what the evidence shows that he did among the workmen and property owners of the village, the jury were justified in finding, what as a matter of common sense they as men knew, that some of this work was done in Will county, and they were warranted in finding that acts so performed were in furtherance of the conspiracy. The defendant Thompson lived in Chicago and was employed by Blumenberg and Geppert in making investigations and writing these articles: He spent some time in Steger in that effort, but there is the same question as to which side of the county line he might be working. Counsel for plaintiff in error say that the question of venue is one of fact for the jury, which is no doubt true, and it is to be established with the same measure of proof required of other material facts in the case (*Spalding v. People,* 172 Ill. 40); and we hold, as did the court in that case, that while the evidence might have been more specific it was sufficient, in the absence of contrary proof, to authorize a finding that the venue was proved. It is said in *Weinberg v. People,* 208 Ill. 15, on page 19: "It is not necessary that some one testify, in so many words, to the place where the offense was committed,

but it is sufficient if the evidence, as a whole, leaves no reasonable doubt as to the act upon which the indictment is based having been committed at the place laid in the indictment. (*Porter v. People,* 158 Ill. 370.) 'The venue of an offense may be proven like any other fact, in a criminal case. It need not be established by positive testimony nor in the words of the information, but if, from the facts appearing in evidence, the only rational conclusion which can be drawn is that the offense was committed in the county alleged, it is sufficient.' *Weinecke v. State,* 34 Neb. 14."

We do not agree with counsel that this construction of the law works an undue hardship on their client in taking him for trial into a place far from his home. If there was a conspiracy it was certainly aimed at an industry in Will county, upon which many people there were dependent; and if inflammatory matter fired from New York City, with an aim to injure people and interests in Will county, landed there, it seems proper that the action should be there prosecuted. In *Hyde v. United States,* 225 U. S. 347, the court said, quoting from an earlier case: "It is not an oppression in the law to accept the place where an unlawful purpose is attempted to be executed as the place of its punishment, and rather conspirators be taken from their homes than the victims and witnesses of the conspiracy be taken from theirs. We must not, in too great a solicitude for the criminal, give him a kind of immunity from punishment because of the difficulty in convicting him—indeed, of even detecting him. * * * Let him meet with his fellows in secret, and he will try to do so; let the place be concealed, as it can be, and he and they may execute their crime in every State in the Union, and escape punishment in all. * * * The possibility of such a result * * * demonstrates that to yield to it would carry technical rules and rigidity of reasoning too far for the practical administration of criminal justice." And in *Brown v. Elliott,* 225 U. S. 392, the court said: "The

Constitution of the United States is not intended as a facility for crime. It is intended to prevent oppression; and its letter and its spirit are satisfied if, where a criminal purpose is executed, the criminal purpose be punished. It is there that its victims are sought and defrauded. It is there that its perpetrators should be brought to the bar of justice for their acts; not for the mere conception of them, but for the actual execution of them. The venue of his trial is thus made by the criminal himself, not determined by reasons or interests which may be adverse to him and used to his injury."

It is argued that the indictment is bad in charging separate and distinct offenses in the same count; that it in some counts charges a conspiracy in October, 1907, in the city of Chicago, with allegations of subsequent overt acts in the county of Will, which are separate and distinct transactions to avoid the statute of limitations and bring the case within the jurisdiction of the court of that county; therefore that, at best,' the inquiry is whether there was any conspiracy formed in Chicago in 1907, and if there was not, then there can be no conviction under counts so charging; and it is said there is no evidence of a conspiracy at that time and place. The time and place is alleged in the counts in question under a *videlicit*, the use of which is to avoid variance between allegations and proof. It is said in *Hyde v. United States, supra*: "As the overt acts give jurisdiction for trial, it is not essential where the conspiracy is formed, so far as the jurisdiction of the court in which the indictment is found and tried is concerned;" and there are other counts in the indictment that allege the conspiracy in Will county that may be supported by the evidence of overt acts performed there. We are not unmindful that the crime of conspiracy as defined by the Federal statutes differs from the common law in making an overt act a part of the crime, and so far as the discussion in *Hyde v. United States* is based on that

feature of that statute, it is not applicable here; but the court at considerable length discusses the common law, reviewing authorities, and concludes that at common law as well as under the statute conspirators may be punished in the county where the overt act is committed without evidence of an expressed renewal of the agreement. But the case at bar was prosecuted and evidence admitted on the theory that the conspiracy was formed outside of Will county and overt acts committed there within the time limited by the statute, and it is necessary to consider whether a claim that the conspiracy was formed as early as 1907 finds support in the evidence; for instance, declarations of Blumenberg made in 1907 were proven over objections which were not competent against Geppert if they were made before the conspiracy was formed, because of the rule that counsel for plaintiff in error correctly state as follows: "Evidence of the acts or sayings of an alleged coconspirator prior to the time when the evidence tends to establish the existence of the conspiracy, are not admissible in evidence."

In addition to and explanation of the facts we have heretofore briefly stated, the record shows that in 1905 John V. Steger's manufacturies had assumed large proportions and he had become influential and well known in the piano trade. He was paying $600 a year for advertisements in the Musical Courier Extra. In 1905 and 1906 Geppert visited his factory and induced him to increase his advertising contract to $1,000 a year, which sum was not satisfactory to Blumenberg and Geppert and they were discussing means to increase his contributions; and in October, 1907, Blumenberg wrote a laudatory article entitled "Mr. Steger's Aggresive Challenge," and took it to his office and there offered to publish it in the Musical Courier Extra for $3,500. There is some evidence that this article was intended by Blumenberg to injure Steger by antagonizing musical artists. It contained what might be construed as a slur on them, and is called

the "Paderewski Article;" but be that as it may, it was intended to appeal to Mr. Steger as an effort to aid his business, and he so construed it. We have no duty to pass upon or even to criticize newspaper ethics, and only say that so far as we know, Blumenberg violated no law in so offering this article to Mr. Steger, and up to that point that act furnished no evidence that he and Geppert were conspiring to extort money from him. But Mr. Steger did not accede to Blumenberg's demand that he pay $3,500 for the article, and was very blunt and direct in his refusal to do so; whereupon Blumenberg in unmistakable terms threatened to attack him and his business by publications in the Musical Courier Extra if he did not yield. The matter was then adjusted by Mr. Steger paying $750 for the article and continuing his advertising contract at $1,000 a year. Geppert testified that he was present at that interview, but he gives an entirely different account of the transaction and one that in no way tends to prove a conspiracy at or before that time. Mr. Steger and his son, who testified to the transaction, say Geppert was not present and the jury probably believed that he was not; but they may have believed that he was there and was wrong about what was there said. Assuming that Geppert was not present, does proof that this act of Blumenberg's when taken in connection with the other evidence in the case, tend to show a conspiracy between Blumenberg and Geppert at and before that time? There is evidence that in 1904 Geppert was told that John V. Steger said that Blumenberg was a blackmailing crook, and that Geppert got furious and said that he would get even with Steger if it was the last act of his life, that he would take the matter up with Blumenberg and they would line up a plan of attack, that he would wait an opportune time, and mentioned another man that it had taken him a long time "to put it over." Declarations of a person charged with conspiracy

made before the conspiracy was formed are competent evidence against him, though not against a coconspirator. We have no doubt this was competent evidence for the jury to consider in determining whether Geppert and Blumenberg had formed the conspiracy charged as early as this "Paderewski Article" transaction, and that they were justified in finding that the conspiracy was formed before that time, and the People were properly permitted to prosecute the case on that theory, and on the theory that this act of Blumenberg's was not an independent transaction. Confusion arises if we do not keep in mind that this is not a prosecution to punish some act done in furtherance of a conspiracy. It is a prosecution of the charge of conspiracy to do certain things charged, and proof of the act done is evidence of the conspiracy formed prior thereto. The conspiracy did not begin by the act of Blumenberg in writing the Paderewski article or in threatening to attack Steger if he did not pay for it, but it began in the plan made before that time to pursue that line of conduct. This is not a prosecution of the crime of extortion by threats as defined in section 93 of our Criminal Code (J. & A. ¶ 3647), nor are we considering an indictment for criminal libel however much the facts proven may tend to show Geppert guilty, either as principal or accessary, of such crimes. The question is did Geppert, in the manner charged in the indictment, combine with others to accomplish a criminal or unlawful purpose or a lawful purpose by unlawful or criminal means, or to do the acts which constitute the statutory crime of conspiracy? If he did, then the crime charged was complete when the agreement was made. Overt acts done in carrying out the agreement serve as evidence that before the act there was a plan, and serve to toll the statute of limitations and fix the venue of the crime.

The $750 received for the publication of the Pade-

rewski article was far from satisfactory to Blumenberg and Geppert, and they are shown often expressing the intention to keep after Steger. Early in 1909 Geppert said he was going to Chicago to put the screws to him, that he was making 15,000 to 20,000 pianos a year and he would make him pay fifty cents a piano or attack his moral character and conditions of his factory. Geppert did go to Steger's office in Chicago at about that time and proposed that he spend with them at least fifty cents a piano, and Steger resented the proposition and said that he would not be held up by him and Blumenberg any longer, and Geppert replied that he had brought others to terms and they would bring him. Shortly afterwards, one Couchois, an employee of Blumenberg and Geppert called on Mr. Steger and made specific threats of what the Musical Courier Extra would do in attacking his character and his business if he did not accede to their demands, and Couchois says, testifying for the People, that he was sent on that mission by Blumenberg and Geppert with specific directions from them which he was carrying out. Mr. Steger left him before he finished his story, and all business transactions between the parties then ceased, and the attack began, the codefendants Thompson and Maloy acting as agents of or in conjunction with Blumenberg and Geppert in some of them. An article was printed in the Musical Courier Extra March 6, 1909, which on its face purported light fiction. It was in Blumenberg's department of the paper and probably written by him, and was so written that Mr. Steger would understand when read in connection with what he had been told by Couchois and Geppert that it referred to him. It contained inuendoes and references that would be understood by Mr. Steger to threaten additional chapters if a settlement was not made; and is said to import to Mr. Steger great moral depravity by the use of terms not understood except in the lower world and by respectable people whose

duties throw them in contact with that world. Mr. Steger ignored the article but ceased to patronize the paper, and thereafter the publication of abusive articles began and persistently continued up to the time of the indictment.

Geppert in his testimony contradicts many of the material statements of fact above made and is in some instances corroborated, but we are of the opinion that there was abundant evidence from which the jury could find those facts, and an examination of the record evidence leads us to the conclusion that they were justified in so finding them. Evidence of directions given Couchois by Blumenberg and Geppert on his trip to visit Mr. Steger in the spring of 1909, and their conversations with him about that matter, rests entirely on the testimony of Couchois himself; and his character and truthfulness is much impeached by various matters disclosed in the record. It is not to be presumed that a man of good character could have been sent on or would have undertaken that mission; but he certainly did undertake by threats of blackmail to induce Steger to pay money to Blumenberg and Geppert, and it is natural to believe that he was doing it at their instance. The verdict does not rest on his testimony further than his statements would naturally be credited from their inherent probability. When it is known that on Steger's refusal to comply with their demands, Blumenberg and Geppert made a vicious attack on him, and that each of them as early as 1907 threatened such an attack, it is natural to believe a person who was in their company when he says they planned the attack that they made. Counsel also attack the character and testimony of the People's witness Fischel, and the reasoning applied to Couchois and his testimony is equally applicable to him. The attack itself was evidence of a preconceived plan. It was not necessary to show meetings and consultations between the parties indicted. Conspiracy may be im-

plied from proof of overt acts. *Ochs v. People,* 124
Ill. 399; and *Spies v. People,* 122 Ill. 1. The indict-
ment charges a conspiracy to extort money from, to
injure the character, business, employment and prop-
erty of John V. Steger, and the business and property
of his two corporations. We see no reasonable in-
ference from the facts proven, except that the acts
complained of were all performed in furtherance of
one plan of Blumenberg and Geppert made as early
as 1907 to accomplish what they afterwards attempted
to do by their publications. As said in *Hyde v. United
States, supra,* one starting evil forces must withdraw
his support from them or incur the guilt of their con-
tinuance. There can be no claim that their acts were
not aimed at the ends, or some of them, charged in
the indictment. It may well be that before the end
they abandoned the hope of extorting money, but they
certainly designed to injure Steger's character and
business. Nor does it seem important that consider-
able periods of time elapsed with no overt act com-
mitted; it was not a plan to be executed quickly, it
required time and patience. Neither is it necessary
or to be supposed that the plan in its inception or early
stages embraced in detail the various means by which
it should be executed; it is sufficient that there was a
general plan to accomplish the result by means that
might from time to time be found expedient. *Spies
v. People, supra.*

It is argued that the counts of the indictment charg-
ing the crime in the language of the statute are insuffi-
cient and bad because they do not set out with partic-
ularity the means by which the conspiracy was entered
into or was to be effected. It is a sufficient answer
to say that such counts have been held good by our
Supreme Court in many cases: *Cole v. People,* 84 Ill.
216, is an early conspiracy case, and *People v. Nall,*
242 Ill. 284, one of the later cases. The same com-
plaint is made of each count of the indictment, that

it does not with sufficient particularity describe the crime charged. We are of the opinion that each count is good. The indictment is very long, too long to quote, and most of the counts are more open to the criticism that the evidence is unnecessarily pleaded than to the objection that they are not sufficiently expansive in their allegations. While one good count in an indictment is sufficient to sustain a conviction, there are instructions complained of that refer the jury to the indictment that might require attention if we held one count bad, and we have examined each count with that in view.

It is argued that there is a fatal variance between the indictment and the proof, and the discussion under that head is on the theory that different and independent transactions, which even if they were proof of a conspiracy were not evidence of the conspiracy charged, were permitted to be proven. In the views already expressed, we have sufficiently discussed that question.

Counsel urge as error that the prosecution was permitted to prove that Blumenberg "had fled the country." It did appear in evidence that he was and had for some time been in Paris. That was hardly equivalent to showing flight or that he was a fugitive from justice, and in the evidence of that fact there was not a connection to impress the jury that its object was to show flight. We do not think it was error to show where Blumenberg was at the time of the trial. It was hardly possible to get through the narration of his movements and communications with other people during the period covered by this investigation without its incidentally appearing where he then was. We may as well say in this connection that it is also urged as error that counsel for the People stated in his argument to the jury that Blumenberg sought safety in France. We are inclined to regard this as error, but we do not regard it an error that affected the verdict in the case.

In as long a trial as this some error must always occur, and in the view we take of the defendant's guilt, the error falls within the decisions of our Supreme Court, among which are: *Garrity v. People,* 107 Ill. 162; *Spies v. People, supra; Gallagher v. People,* 211 Ill. 169; *Siebert v. People,* 143 Ill. 571; and *Spahn v. People,* 137 Ill. 538,—holding improper remarks of the prosecuting attorney not reversible error.

Numerous objections are made to remarks of the court during the trial. We find nothing serious in any of them. Counsel have selected one which they say, coupled with the statement of the prosecuting attorney at the time, is so improper and prejudicial to the defendant's rights that it constitutes in itself reversible error. It arose on an attempt to show something that Blumenberg had said in 1904, objected to by Mr. Forrest, counsel for the defendant, on the ground that "what Mr. Blumenberg may have said prior to 1904 is too remote." The court remarked that it was pretty remote and the prosecutor said: "Well, Mr. Blumenberg was determined to punish Mr. Steger before that time, 1904." Mr. Forrest objected to the statement on the ground that it was not relevant and an attempt to inject testimony into the case. The court said: "He has a right to give his reasons, but I don't suppose that you have any right to introduce testimony of the statement that Mr. Blumenberg made before the time when the attempts to form a conspiracy were made," and sustained the objection. The argument is, that the court assumed there had been attempts to form a conspiracy. This was part of a colloquy between court and counsel in the trial of a case that makes a record of over 5,000 pages, and that counsel for plaintiff in error in presenting to this court have used 450 pages of brief. So far as we can see, they are right in emphasizing this transaction as the chief cause of complaint as to remarks of the court. Of course it would be better if a court might be gifted with absolute accuracy of expression in what he is

impelled to say in a colloquy during a trial in which two or three attorneys are taking part, all talking at once, and if the court had been so gifted he might have said "before the time when there was proof of attempts" instead of "before the time when there were attempts to form a conspiracy;" but we regard the incident as trivial and the assertion of the prosecuting attorney as nothing more than must frequently happen in the trial of any case,—that the attorney addressing the court asserts something to be true which he is not permitted to prove when he offers his witness.   Of course trials must be guarded, and efforts to influence the jury by remarks made to the court in their presence must be rebuked and suppressed, but whether a remark is so intended, or likely to have such effect, is peculiarly within the knowledge of the trial judge who knows the surrounding circumstances, the manner of counsel, and many other things in that connection that are not shown in a printed record; and much must be left to his judgment and discretion in conducting the trial in that respect and passing on the question whether the jury have been improperly influenced by such remarks, which he must do in considering a motion for a new trial.   As we have before said, we see nothing of importance in this complaint.

About 40 pages of the abstract are covered by instructions given by the court, divided about equally between those asked by the People and by the defendant; about 100 pages of the briefs of plaintiff in error are devoted to an attack on the instructions given for the prosecution.   It is argued that each of them is bad, excepting the familiar stock instructions on reasonable doubt, etc.   It is not practicable to follow counsel in their various suggestions of error in each instruction, and not possible within the limitation of space that must be observed to notice each suggestion.

It is strongly urged that the court erred in referring the jury to the indictment by phrases like "as

charged in the indictment:'' First, because it is said the counts in the indictment are not all good, and we are referred to cases holding such reference to an indictment or a declaration error where there is a bad count. As we have before said, we regard each count in the indictment good. Second, because it is said the indictment is long and would not be understood by the jury and therefore they should not have been referred to it; and again that the defense of fair comment was interposed and there is no allegation in the indictment that the publications were not fair comment. This position is not well taken for two reasons: First, the court gave for the defendant instructions referring the jury to the indictment, and it is familiar law that a party cannot assign error in giving an instruction of the same character as one given at his request. *Jacksonville & St. L. Ry. Co. v. Wilhite*, 209 Ill. 84. Second, it is not error to so refer the jury to the indictment if each count contains the necessary allegation for conviction. *Parker v. People*, 97 Ill. 32. It is true the practice has been criticised by that court in civil cases, but it is still persisted in by lawyers offering instructions, as it was in this case by both sides, and error cannot be predicated thereon. *Latham v. Cleveland, C., C. & St. L. Ry. Co.*, 179 Ill. App. 324. It is said the jury were mislead as to the law of fair comment. We have discovered little ground in the evidence on which to base a defense of fair comments. It is true, as before said, that many statements in the articles in question may be fair comment, but there are other statements in the same articles that by no stretch of the imagination can be so construed; still it is a pertinent inquiry whether the jury were properly instructed on that question. The court at the instance of the defendant gave six instructions on that feature of the case, in which the jury were told that the manner in which the public affairs of the village of Steger were administered

and conducted, advertisements of Steger and Sons in magazines and newspapers, the career of John V. Steger in so far as it was dealt with in a certain pamphlet mentioned, the manufacture and sale of stencil pianos by the Singer Piano Company, the manner in which the workmen in the Steger factories were dealt with, and the wages paid such workmen, were things of public interest, and it was the right and privilege of any person to print and publish fair comment thereon. This specification of matters covers subjects dealt with in the articles in question, and in so far as there can be any question of fair comment, covered the case. The instructions are however more likely to have been misunderstood by the jury, and construed as meaning that one is licensed by law to attempt to extort money by threatening to publish, and publishing, the truth about a man and his business, than are other instructions complained of given for the People dealing with some one feature of the case to mislead the jury by directing their attention to that one thing; such instructions are always open to such an argument. The court properly refused to instruct that erroneous opinions, unwarranted inferences and unsound arguments expressed in harsh and violent language calculated to ridicule or defame or cause pecuniary loss were fair comment; but did instruct at the instance of the People that on the question of fair comment it was the duty of the jury to consider all the facts and circumstances in the case and determine whether the articles were published for the purpose of making fair comment or wickedly and maliciously, and that the truth is not a defense to the publication of malicious and defamatory statements unless said publication be with good motives and for justifiable ends. And also gave the following instruction:

"The court instructs the jury, as a matter of law, that if two or more persons combine, unlawfully, to defame another, by publishing true statements con-

cerning him which, although they are true, are published with the malicious intent and motive wrongfully and wickedly to defame and injure his character, and to impeach his honesty, virtue or reputation, and thereby expose him to public hatred, contempt and ridicule, they are guilty of the crime of conspiracy.''

Counsel complain of this instruction and argue that the truth is a defense to a criminal action of libel, and cite authorities. Truth is not a defense in this State to an indictment for libel unless published with good motives and for justifiable ends. *People v. Strauch,* 247 Ill. 220; *People v. Fuller,* 238 Ill. 116, affirming this court (141 Ill. App. 374). The court also gave for the People the following instructions:

''The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that William Geppert and Marc A. Blumenberg conspired together as charged in any one count of the indictment in this case, and were carrying out said conspiracy in Will county within eighteen months before the return of the indictment in this case, it will be your duty to find William Geppert guilty.''

''The court instructs the jury, as a matter of law, that to constitute the crime of conspiracy it is not necessary that the conspirators should succeed in their design. It is enough if the common design was formed in manner and form as charged in the indictment, and that thereafter any act was done in this county in furtherance of such design by any one of the conspirators within eighteen months before the indictment was returned. If the conspiracy charged in the indictment has been proved to the satisfaction of the jury, beyond a reasonable doubt, then the acts of any one of the conspirators in furtherance of the common design, if proved, will be regarded as the act of all.''

In addition to complaints already referred to, counsel contend that these two instructions are bad because the jury were told it was sufficient if defendants ''were

carrying out said conspiracy in Will county,'' or that ''any act done in this county in furtherance of such design by any one of the conspirators;'' when, as they say, simply an act is not enough, it must have been an overt act which is an open act as distinguished from a secret, concealed act. Assuming this definition and the necessity of observing it if the evidence had shown acts in Will county in carrying out the conspiracy that did not fall within its terms, still we cannot see how a failure in these instructions to observe the technical distinction between acts and overt acts could have prejudiced the defendant. The acts shown in evidence and which the jury were considering, and concerning which they required instructions on the law applicable thereto, were open acts. We also note that in instruction 72, offered by and given for the defendant, there was the same failure to notice that the conspiracy could only be located in Will county by an overt act performed there.

We have noticed what seems to us the principal objections urged to the instructions. There is also error assigned and argued as to instructions offered by the defendant and refused; but we are of the opinion that the jury were fully and fairly instructed on what we believe the correct governing rules of law, and that the instructions read as a whole could not have misled them, and that there was no reversible error in giving, refusing or modifying instructions.

On the motion for a new trial, affidavits of newly-discovered evidence were filed, among them that of the witness Couchois who, in the meantime, seems to have gone over to the defendant's side of the case. His affidavit covers questions of improper conduct of the jury after the case was submitted to them and contains other statements by which he attempts to modify the effect of the testimony which he gave at the trial, although he reasserts the truth of that testimony. We discover nothing in these affidavits that

in our judgment entitled the defendant to a new trial. We are of the opinion that he received a fair and impartial trial in accordance with the established rules of law; that the jury were fully warranted in finding him guilty and fixing his punishment as they did by their verdict, and that the court properly sentenced him on that verdict. The judgment is therefore affirmed.

*Affirmed.*

MR. JUSTICE DIBELL took no part in this decision.